## Case No. 104.

### In re AH YUP.

[5 Sawy. 155;[1] 6 Cent. Law J. 387; 17 Alb. Law J. 385; 24 Int. Rev. Rec. 164.]

Circuit Court, D. California.   April 29, 1878.

NATURALIZATION—CHINESE—ACT 1875.

1. A native of China, of the Mongolian race, is not entitled to become a citizen of the United States under the Revised Statutes as amended in 1875.   Rev. St. § 2169; Amend. Rev. St. p. 1435.

[Cited in Re Ah Chong, 2 Fed. Rep. 739.]

2. A Mongolian is not a "white person" within the meaning of the term as used in the naturalization laws of the United States.

[Cited in Re Camille, 6 Fed. Rep. 256.]

Application for naturalization by a native of China.

B. S. Brooks, for petitioner.
S. Heydenfeldt, Jr., contra.

SAWYER, Circuit Judge. Ah Yup, a native and citizen of the empire of China, of the Mongolian race, presented a petition in writing, praying that he be permitted to make proof of the facts alleged, and upon satisfactory proof being made, and his taking the oath required in such cases, he be admitted as a citizen of the United States. The petition stated all the qualifications required by the statute to entitle the petitioner to be naturalized, provided the statute authorizes the naturalization of a native of China of the Mongolian race. The petitioner was represented by B. S. Brooks, a counsellor of this court. This being the first application made by a native Chinaman for naturalization, the members of the bar were requested by the court to make such suggestions as amici curiae as occurred to them upon either side of the question; whereupon S. Heydenfeldt, Jr., argued the case very fully in opposition to the application. Suggestions were also made by other members of the bar present. The only question is, whether the statute authorizes the naturalization of a native of China of the Mongolian race.

In all the acts of congress relating to the naturalization of aliens, from that of April 14, 1802, down to the Revised Statutes, the language has been "that any alien, being a free white person, may be admitted to become a citizen," etc. After the adoption of the thirteenth and fourteenth amendments

to the national constitution; the former prohibiting slavery, and the latter declaring who shall be citizens, congress in the act of July 14, 1870, amending the naturalization laws, added the following provision: "That the naturalization laws are hereby extended to aliens of African nativity, and to persons of African descent." 16 Stat. 256, § 7. Upon the revision of the statutes, the revisors, probably inadvertently, as congress did not contemplate a change in the laws in force, omitted the words "white persons;" section 2165 of the Revised Statutes, being the section conferring the right, reading: "An alien may be admitted to become a citizen," etc., etc. The provision relating to Africans of the act of 1870, is carried into the Revised Statutes in a separate section, which reads as follows: "The provisions of this title shall apply to aliens of African nativity, and to persons of African descent." Section 2169. This section was amended by the "act to correct errors and to supply omissions in the Revised Statutes of the United States," of February 18, 1875, so as to read: "The provisions of this title shall apply to aliens being free white persons, and to aliens of African nativity, and to persons of African descent." Rev. St. (1st Ed.) p. 1435; 18 Stat. 318. And so the statute now stands.

The questions are: 1. Is a person of the Mongolian race a "white person" within the meaning of the statute? 2. Do these provisions exclude all but white persons and persons of African nativity or African descent. Words in a statute, other than technical terms, should be taken in their ordinary sense. The words "white person," as well argued by petitioner's counsel, taken in a strictly literal sense, constitute a very indefinite description of a class of persons, where none can be said to be literally white, and those called white may be found of every shade from the lightest blonde to the most swarthy brunette. But these words in this country, at least, have undoubtedly acquired a well settled meaning in common popular speech, and they are constantly used in the sense so acquired in the literature of the country, as well as in common parlance. As ordinarily used everywhere in the United States, one would scarcely fail to understand that the party employing the words "white person" would intend a person of the Caucasian race.

In speaking of the various classifications of races, Webster in his dictionary says, "The common classification is that of Blumenbach, who makes five. 1. The Caucasian, or white race, to which belong the greater part of the European nations and those of Western Asia; 2. The Mongolian, or yellow race, occupying Tartary, China, Japan, etc.; 3. The Ethiopian or Negro (black) race, occupying all Africa, except the north; 4. The American, or red race, containing the Indians of North and South America; and, 5. The Malay, or Brown race, occupying the

[1][Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

islands of the Indian Archipelago," etc. 'This division was adopted from Buffon, with some changes in names, and is founded on the combined characteristics of complexion, hair and skull. Linnaeus makes four divisions, founded on the color of the skin: "1. European, whitish; 2. American, coppery; 3. Asiatic, tawny; and, 4. African, black." Cuvier makes three: Caucasian, Mongol, and Negro. Others make many more, but no one includes the white, or Caucasian, with the Mongolian or yellow race; and no one of those classifications recognizing color as one of the distinguishing characteristics includes the Mongolian in the white or whitish race." See New American Cyclopedia, tit. "Ethnology."

Neither in popular language, in literature, nor in scientific nomenclature, do we ordinarily, if ever, find the words "white person" used in a sense so comprehensive as to include an individual of the Mongolian race. Yet, in all, color, notwithstanding its indefiniteness as a word of description, is made an important factor in the basis adopted for the distinction and classification of races. I am not aware that the term "white person," as used in the statutes as they have stood from 1802 till the late revision, was ever supposed to include a Mongolian. While I find nothing in the history of the country, in common or scientific usage, or in legislative proceedings, to indicate that congress intended to include in the term "white person" any other than an individual of the Caucasian race, I do find much in the proceedings of congress to show that it was universally understood in that body, in its recent legislation, that it excluded Mongolians. At the time of the amendment, in 1870, extending the naturalization laws to the African race, Mr. Sumner made repeated and strenuous efforts to strike the word "white" from the naturalization laws, or to accomplish the same object by other language. It was opposed on the sole ground that the effect would be to authorize the admission of Chinese to citizenship. Every senator, who spoke upon the subject, assumed that they were then excluded by the term "white person," and that the amendment would admit them, and that the amendment was advocated on the one hand, and opposed on the other, upon that single idea. Senator Morton, in the course of the discussion said: "This amendment involves the whole Chinese problem. * * * The country has just awakened to the question and to the enormous magnitude of the question, involving a possible immigration of many millions, involving another civilization; involving labor problems that no intellect can solve without study and time. Are you now prepared to settle the Chinese problem, thus in advance inviting that immigration?" Congressional Globe, pt. 6, 1869–70, p. 5122. Senator Sumner replied: "Senators undertake to disturb us in our judgment by reminding us of the possibility of large numbers swarming from China; but the answer to all this is very obvious and very simple. If the Chinese come here they will come for citizenship, or merely for labor. If they come for citizenship then in this desire do they give a pledge of loyalty to our institutions, and where is the peril in such vows? They are peaceful and industrious; how can their citizenship be the occasion of solicitude?" Id. 5155.

Many other senators spoke pro and con on the question, this being the point of the contest, and these extracts being fair examples of the opposing opinions. Id. 5121–5177. It was finally defeated, and the amendment cited, extending the right of naturalization to the African only, was adopted. It is clear, from these proceedings that congress retained the word "white" in the naturalization laws for the sole purpose of excluding the Chinese from the right of naturalization. Again, when it was found that the term "white person" had been omitted in the Revised Statutes it was restored by the act passed "to correct errors and to supply omissions" in the Revised Statutes before cited. Upon reporting this bill, Mr. Poland, chairman of the committee, explained the various amendments correcting the errors, and upon the amendment to insert the words "being free white persons," said: "The original naturalization laws only extended to free white persons. * * * A very few years since [in 1870] Mr. Sumner, of Massachusetts, then in the senate, moved to strike out the word 'white' from the naturalization laws, and it was objected to on the ground that that would authorize the naturalization of that class of Asiatic immigrants that are so plentiful on the Pacific coast. After considerable debate, instead of striking out the word 'white,' it was provided that the naturalization laws should extend to Africans, and persons of African descent." After explaining the omission in the Revised Statutes he adds: "The member of our committee who had this chapter on the naturalization laws to examine as a sub-committee, failed to notice this change in the law, or it would have been brought before the house when the revision was adopted." Congressional Record, vol. 4, pt. 2, Sess 1875, p. 1081. Upon this report the amendment was made as it now stands in the statute. Thus, whatever latitudinarian construction might otherwise have been given to the term "white person," it is entirely clear that congress intended by this legislation to exclude Mongolians from the right of naturalization. I am, therefore, of the opinion that a native of China, of the Mongolian race, is not a white person within the meaning of the act of congress.

The second question is answered in the discussion of the first. The amendment is intended to limit the operation of the provision as it then stood in the Revised Statutes. It would have been more appropriately inserted in section 2165, than where it is found in sec-

tion 2169. But the purpose is clear. It was certainly intended to have some operation, or it would not have been adopted. The purpose undoubtedly was to restore the law to the condition in which it stood before the revision, and to exclude the Chinese. It was intended to exclude some classes, and as all white aliens and those of the African race are entitled to naturalization under other words, it is difficult to perceive whom it could exclude unless it be the Chinese. It follows that the petition must be denied, and it is so ordered.