In re YOUNG.

(District Court, W. D. Washington, N. D. August 15, 1912.)

No. 1,089.

ALIENS (§ 61*)—NATURALIZATION—"WHITE PERSON."

The son of a German father and a Japanese mother is not a "white person," within the meaning of Rev. St. § 2169 (U. S. Comp. St. 1901, p. 1333), and not eligible to naturalization.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122; Dec. Dig. § 61.*

For other definitions, see Words and Phrases, vol. 8, pp. 7446, 7447.]

Petition by Albert Henry Young for naturalization. On rehearing. Petition denied.

For former opinion, see 195 Fed. 645.

John Speed Smith, Chief Naturalization Examiner, for the United States.

A. J. Balliet, E. S. McCord, and R. W. McClelland, for applicant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CUSHMAN, District Judge. The following causes are relied upon by applicant: Ludlam v. Ludlam, 31 Barb. (N. Y.) 486; In re Saito (C. C.) 62 Fed. 126; In re Kumagai (D. C.) 163 Fed. 922; U. S. v. Balsara, 180 Fed. 694, 103 C. C. A. 660; In re Hallajian (C. C.) 174 Fed. 834; In re Mudarri (C. C.) 176 Fed. 465; Bessho v. U. S., 178 Fed. 245, 101 C. C. A. 605; In re Camille (C. C.) 6 Fed. 256; In re Knight (D. C.) 171 Fed. 299.

This applicant for naturalization has fully complied with all of the requirements of the statutes as an alien petitioner to be admitted as a citizen of the United States, but it was heretofore decided by the judge of this court that he was not eligible for the reason that he was not a white man. By the proofs submitted, it was shown that he was born at a place in Yokohama, Japan, under the dominion of the Emperor of Germany, that he is a subject of the Emperor of Germany, and that his father is a German and his mother a Japanese woman. The court ruled that the right to become a naturalized citizen of the United States depends upon parentage and blood, and not upon nationality or status. After the making of this ruling, it was ordered that the cause be reopened for further consideration, presentation of argument and authorities, and disposition, which hearing has now been had.

In the former ruling, the court approved and adopted as its own the reasoning in the decision of In re Knight, 171 Fed. 299, which authority is reinforced by In re Ah Yup, 1 Fed. Cas. 223, No. 104, refusing the right of naturalization to a Chinaman, which case was decided prior to the act of May 6, 1882, section 14 of which (22 Stat. at Large, 61, c. 126 [U. S. Comp. St. 1901, p. 1333]) expressly prohibits the admission of Chinese to citizenship; Fong Yue Ting v. United States, 149 U. S. 698, 716, 13 Sup. Ct. 1016, 37 L. Ed. 905; In re Camille (C. C.) 6 Fed. 256, in which latter case the son of a white Canadian father and an Indian mother was denied the right of naturalization; In re Saito (C. C.) 62 Fed. 126, rejecting the application of a Japanese; In re Kanaka Nian, 6 Utah, 259, 21 Pac. 993, 4 L. R. A. 726, to the same effect in the case of a Hawaiian; Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643.

The fact that the petitioner was born within the German legation, giving him the status of a German subject, in no way affects the question. "The power to say when and under what circumstances an alien may become a citizen belongs to Congress." In re Camille, supra. Congress has, by section 2169, R. S. (U. S. Comp. St. 1901, p. 1333), limited the right of naturalization to those aliens being "free white persons and to aliens of African nativity and to persons of African descent."

The term "white person" must be given its common or popular meaning. As commonly understood, the expression includes all European races and those Caucasians belonging to the races around the Mediterranean Sea, whether they are considered as "fair whites" or "dark whites," as classified by Huxley, and notwithstanding that certain of the southern and eastern European races are technically classified as of Mongolian or Tartar origin.

It is just as certain that, whether we consider the Japanese as of

the Mongolian race, or the Malay race, they are not included in what are commonly understood as "white persons." In the abstractions of higher mathematics, it may be plausibly said that the half of infinity is equal to the whole of infinity; but in the case of such a concrete thing as the person of a human being it cannot be said that one who is half white and half brown or yellow is a white person, as commonly understood. In Louisiana, a person was deemed white if the African blood did not exceed one-eighth. The same was true in the Colonial Code Noir of France, 2 Kent, 72, note "b." In Ohio, if there was more white blood than black or red, the person was considered white; but, if the colored blood was equal, the person was not white. Jeffries v. Ankeny, 11 Ohio, 372; Gray v. State, 4 Ohio, 354. In Virginia and Kentucky the dividing line was generally recognized as the quarter-blood. Dean v. Commonwealth, 45 Va. 541; Gentry v. McMinnis, 3 Dana (Ky.) 382; 30 Encyc. Law, 2d Add., 517.

Courts have found it necessary in certain cases to ascribe to a child either the status of the father or mother, as where one parent was a slave and the other free; and, treating a slave as any other animal property and following the civil law, they have held that the child took the status of the mother. In cases involving the jurisdiction of the court, as where the court had no jurisdiction to try an Indian for a crime committed against an Indian, and it was considered necessary to ascribe the defendant's status to one or the other parent, Indians being freemen, the common law has been followed, and the child has been held to take the status of the father. These decisions arose from the necessity for the adoption of an artificial rule. There is no such necessity in the case at bar. It is not necessary to determine the exact status of the petitioner. All that is necessary is to determine whether he is a "white person" within the meaning of the law.

Counsel for petitioner chiefly rely upon the case In re Rodriguez (D. C.) 81 Fed. 337. In that case the petitioner was a Mexican. It appears that the case was controlled by the fact that the natives of Mexico had for over 300 years been mixing their blood with that of the natives and descendants of Spain; indulging in the presumption that after that length of time the dominant race would have established itself. Further, the court was controlled by the treaty with Mexico of 1868, expressly recognizing the right of Mexicans to become naturalized citizens of the United States. This treaty had, prior to the decision, been abrogated; but, as showing the government's construction of the law limiting the right to citizenship, applied to natives of Mexico, it was considered persuasive. If this decision goes further than here indicated, it is opposed to what this court considers the weight of authority.

Petition denied.